IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | Case No. 03 CR 0689 (-02) |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| MAGIN VILLASENOR, | ) | |
|     Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Magin E. Villasenor ("Villasenor") has served 17 years of his 25-year sentence for being the leader and organizer of a drug trafficking operation involving the transportation and sale to lower-level dealers of multi-kilogram shipments of cocaine in Texas, Illinois, Michigan, and throughout the Midwest. *See United States v. Villasenor,* 664 F.3d 674, 676–79 (7th Cir. 2011) (summarizing trial evidence). Villasenor moves under 18 U.S.C. § 3582(c)(1)(A)(i) for what is often called compassionate release. The statute permits a court to reduce a defendant's sentence for "extraordinary and compelling reasons" after taking certain matters into account, including the factors considered at sentencing, 18 U.S.C. § 3553(a). After weighing the § 3553(a) factors in light of Villasenor's health risks if he contracts the novel coronavirus, the court denies his motion.

### Background

On November 21, 2003, a grand jury returned a 30-count superseding indictment against 17 defendants; Villasenor was named in 27 counts. *See* Superseding Indictment, ECF No. 155. Before trial, the government notified Villasenor that it intended to seek an enhanced penalty based on his prior convictions for drug charges. ECF No. 314 at 1–2; *see also* 21 U.S.C. § 851. Due to his prior convictions, Villasenor's mandatory minimum sentence for certain drug

1

distribution counts increased from 10 to 20 years. *See* 21 U.S.C. § 841(a)(1) (2002). The 20-year mandatory minimum was the highest mandatory minimum to which Villasenor was subject.

The trial of Villasenor and three of his codefendants began on February 6, 2006. *See* ECF No. 505. Prior opinions describe the facts proven at trial and this case's procedural history in detail. *See United States v. Villasenor,* 664 F.3d 674, 676–79 (7th Cir. 2011) (trial evidence); *United States v. Villasenor,* 2016 WL 806550, at *1–7 (N.D. Ill. Mar. 2, 2016), *aff'd*, 689 F. App'x 851 (7th Cir. 2017) (procedural history pertaining to Villasenor); *see also* Aug. 18, 2004, Pre-Sent. Investigation Report ("PSR") 6–8. In brief, co-defendant Stevie Jones began buying drugs in relatively small distribution quantities from Villasenor in 1996. *Villasenor*, 664 F.3d at 676. By 2003, the conspiracy had grown considerably in scope, and Jones was buying 2–4 kilograms of cocaine from Villasenor once or twice a month. *Id.* Jones and other members of the conspiracy pooled their money to buy cocaine from Villasenor in Texas and Chicago and then resold the drugs. *Id.* At trial, the government introduced evidence of several specific drug transactions. *See id.* at 676–78.

In 2003, government agents searched Villasenor's Chicago apartment. *Id.* at 677. He and his family were in Texas at the time. *Id.* The government agents found, among other things, a loaded handgun under Villasenor's mattress and an extra magazine. *Id.*

The jury convicted Villasenor of 24 counts and acquitted him on three. Judgment 1, ECF No. 925. The counts of conviction included conspiring to possess cocaine with intent to distribute it, 21 U.S.C. §§ 841(a)(1), 846; several counts of drug distribution, § 841(a)(1); using a telephone in connection with drug distribution, § 843(b)(4); and possessing a firearm after having been convicted of a felony, 18 U.S.C. § 922(g)(1). *See* Judgment 1–2, ECF No. 925. The jury found that marijuana distribution was not part of the conspiracy, however. Updated PSR 5,

Sept. 19, 2006. Also, the government does not dispute Villasenor's contention that "there was no evidence of any violence committed or solicited by the defendant." Resp. to Mot. Compassionate Release 10, ECF No. 1062.

A sentencing hearing was held on nonconsecutive days in June and July 2010. *See* Min. Entries, ECF Nos. 916, 917; Sent. Trs., ECF No. 1058 Ex. F-1, F-2 (hearing transcripts).[1] Among other things, the parties litigated the amount of cocaine attributable to Villasenor under the advisory sentencing guidelines. *See* U.S.S.G. § 1B1.3. The government relied on the testimony of cooperating witnesses at trial to estimate, conservatively in its view, that Villasenor was accountable for approximately 187 kilograms of cocaine, but the government presented no evidence, beyond the trial evidence, at the sentencing hearing. *See* Sent. Tr. 8. Based on the trial testimony, the court found that Villasenor was accountable for 50–150 kilograms of cocaine "because of the level of imprecision" in the witnesses' testimony and recollections of the exact amounts of cocaine involved. *Id.* at 14. That made Villasenor's base offense level 36 under the 2005 edition of the guidelines. *Id.* at 15; *see also* Updated PSR 1 (using 2005 edition). Villasenor's offense level was increased by 4 because the court found that he was a leader and organizer of the criminal operation. Sent. Tr. 69; Stmt. of Reasons 3. Under the advisory guidelines, then, Villasenor's range of punishment was 30 years to life (criminal history category IV). Stmt. of Reasons 3.

The court sentenced Villasenor to serve 25 years—5 years more than the mandatory minimum and 5 years below the low end of the advisory guidelines range. *See* Sent. Tr. 86–88. Referring to the need for deterrence, which must be considered when imposing a sentence, 18 U.S.C. § 3553(a)(2), the court stated that a mandatory minimum sentence would not send the

---

[1] The two-day sentencing transcript is continuously paginated. *See* ECF No. 1058 Ex. F-1, F-2. For simplicity's sake, citations will not differentiate between the two transcripts.

appropriate message under Section 3553. *Id*. at 86; *accord* Stmt. of Reasons 3. The court noted that Villasenor was essentially running a drug-trafficking organization as a business. "I frankly don't know how you deter someone who is doing it as a business . . . . That's something you can do when you're 60 years old as well as you can do it when you're 40 years old." Sent. Tr. 78–79; *see also id*. at 86.

Villasenor appealed, and the Seventh Circuit affirmed. 664 F.3d 873 (7th Cir. 2011). He then filed a motion under 28 U.S.C. § 2255 to vacate his sentence. He alleged that he received ineffective assistance from his lawyer during plea negotiations. After holding an evidentiary hearing, this court denied Villasenor's § 2255 motion. 2016 WL 806550 (N.D. Ill. Mar. 2, 2016). The Seventh Circuit affirmed that decision as well. 689 F. App'x 851 (7th Cir. 2017).

## Standard for Sentence Reduction

With three enumerated exceptions, "[t]he court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *United States v. Sutton*, 962 F.3d 979, 983 (7th Cir. 2020). Under the first exception contained in § 3582(c)(1)(A)(i), a court may reduce a sentence on the defendant's motion (or upon motion of the Director of the Bureau of Prisons) "if it finds that:" (1) "extraordinary and compelling reasons warrant such a reduction;" and (2) "that such a reduction is consistent with applicable policy statements issued by the sentencing commission." § 3582(c)(1)(A)(i). The defendant must also exhaust administrative remedies in accordance with the statute before filing a compassionate release motion. The government does not dispute that Villasenor has adequately exhausted his remedies. *See* 1058 Ex. C-1 (copies of defendant's requests made to the warden). *See generally United States v. Gunn*, 2020 WL 6813995, at *1 (7th Cir. Nov. 20, 2020) (citations omitted).

Construing the compassionate release statute, § 3582(c)(1)(A)(i), courts uniformly read the two adjectives modifying "reasons," extraordinary and compelling, as separate requirements, *i.e.*, both must be satisfied. *See, e.g., United States v. Scott*, 461 F. Supp. 3d 851, 862 (E.D. Wis. 2020). The parties approach Villasenor's motion as though a finding of extraordinary and compelling reasons is the gateway to weighing the sentencing factors: (1) if there is at least one extraordinary and compelling reason, (2) weigh the § 3553(a) factors. *See* Mot. Compassionate Release 15–28; Resp. 8–11. In this court's experience, this two-step approach is typical of the many COVID-19-related compassionate release motions it has seen since March 2020. *See generally* Fern L. Kletter, Annot., *COVID-19-Related Litigation: Effect of Pandemic on Release from Federal Custody*, 54 A.L.R. Fed. 3d Art. 1 (2020) (collecting numerous cases nationwide).

Treating a finding of "extraordinary and compelling reasons" as a gateway to the § 3553(a) factors gets the compassionate release statute's text and structure backwards. "When a statute is unambiguous," the statutory interpretation "inquiry 'starts and stops' with the text." *United States v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016) *(quoting United States v. All Funds on Deposit with R.J. O'Brien & Assocs.,* 783 F.3d 607, 622 (7th Cir.2015)) (other citation omitted). In relevant part, the statute reads:

> (c) Modification of an Imposed Term of Imprisonment. The court may not modify a term of imprisonment once it has been imposed except that—
> (1) in any case—
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
> (i) extraordinary and compelling reasons warrant such a reduction . . .

18 U.S.C.A. § 3582(c)(1)(A)(i).

As used in the compassionate release statute, the phrase "after considering" means that the § 3553(a) factors must be considered as part of the analysis of whether extraordinary and compelling reasons exist. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) (construing the statutory phrase "after considering"). The § 3553(a) factors do not carry controlling weight in the analysis of whether extraordinary and compelling reasons exist, nor are they a separate requirement for a sentence reduction. *See id*. The fact that Congress set off the "extraordinary and compelling" finding for a sentence reduction in a separate subdivision reinforces this conclusion. *See Dean v. United States*, 556 U.S. 568, 573–74 (2009).

The government argues that the policy statements of the sentencing commission, § 1B1.13 of the sentencing guidelines, promulgated before the 2018 amendments to 18 U.S.C. § 3582(c)(1)(A), are controlling. But the Seventh Circuit held on November 20, 2020, that district courts must consider the statutory criteria rather than treating the policy statement in § 1B1.13 of the sentencing guidelines as controlling. *United States v. Gunn*, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020) (citing *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020)). The Seventh Circuit stated, however, that "§ 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons.'" *Id.* The policy statement in § 1B1.13 therefore guides the court's exercise of discretion "without being conclusive;" any analysis from the Director of the Bureau of Prisons provided in response to the defendant's request for compassionate release must also be given "substantial weight." *Id. (citations omitted); see United States v. Cochran*, 2020 WL 6158460, at *2–3 (7th Cir. Oct. 21, 2020) (unpublished).

**Discussion**

Villasenor, a 48-year-old man, bases his motion on his risk of complications from COVID-19, the rapid spread of the novel coronavirus through his institution, subsequent changes in the law, and his rehabilitation since he was sentenced in 2010. *See* Mot. Compassionate Release 13–24, ECF No. 1058. Villasenor is housed at the prison camp at the Bureau of Prisons ("BOP") facility in Oxford, Wisconsin ("FCI-Oxford"). ECF No. 1058 Ex. E at 1.

As the compassionate release statute requires, the court begins with the § 3553(a) factors. *See* § 3582(c)(1)(A). Villasenor points to his spotless prison disciplinary history, the courses he has taken in prison, and letters from his family members. As stated above, Villasenor has served approximately 17 years of his 25-year sentence. *See* ECF No. 1058 Ex. E at 8. With credit for good time, the BOP projects that he will be released in about four years, in 2024. *See id.*; Mot. Compassionate Release 5. The BOP today classifies Villasenor as a minimum security risk. *See* ECF No. 1058 Ex. E at 2. And he has a job helping to maintain FCI-Oxford's boilers. *See* ECF No. 1058 Ex. A at 2.

Villasenor's 17 years of positive choices in prison are commendable, but his below-guidelines sentence already reflects them to a large degree. Villasenor had been incarcerated for seven years when he was sentenced in 2010. He received a sentence five years below the bottom of the 30 years–life recommended guidelines range based in part on his clean prison disciplinary history and the many courses he had then taken. *See* Sent Tr.at 73–74, 84. While the court could not know the future in 2010, it nevertheless selected a 25-year sentence based in part on the prediction that Villasenor would continue to improve himself in prison and to give him an incentive to do so. *See id.*

To justify Villasenor's 25-year sentence, this court relied in part on the seriousness of Villasenor's leadership role in this multi-state cocaine distribution operation and the need to deter Villasenor individually. *See* Stmt. of Reasons 3. Deterrence mattered at sentencing because Villasenor, unlike many of the street-level drug defendants who have come before this court, was the leader and organizer of a drug operation that was large, long-running, and sophisticated. Such a drug business could presumably be easily revived upon an individual's release from incarceration. *See* Sent. Tr. 78–79, 86–87.

The concerns the court expressed at Villasenor's sentencing remain significant on this record. If he is released now, Villasenor will not receive the transition support services ordinarily provided to inmates prior to release. He argues that he has a good release plan, but all that is clear on this record is that Villasenor will live with his wife in Chicago and will be able to quarantine for 14 days. *See* ECF No. 1058 Ex. B at 2–3 (letter from Villasenor's wife). Villasenor's daughter and sister suggest that he could provide childcare or start an unspecified business. *Id*. at 4–5. Notably, Villasenor does not say, either in his briefing or his email messages intended for the court's consideration, what he plans to do for a living or what he would do to avoid returning to the lucrative drug trade. *See* ECF No. 1058 Ex. A at 1. Nor does the court see anything in the many courses Villasenor has taken that suggests he has acquired additional vocational skills. He has taken several courses on business and entrepreneurship but that is not inconsistent with the criminal activity that led to Villasenor's conviction. *See* ECF No. 1058. Ex. E at 3–4 (listing courses). In 1997, prior to his prosecution in this case, he already had a certificate showing his skills in boiler engineering. The sentencing commission's nonbinding policy statement directs courts to consider whether the defendant is a danger to the safety of any other person or to the community. § 1B1.13(2) (citing 18 U.S.C. § 3142(g)). For

the reasons just discussed, the court cannot make that finding on this record. Nor do the § 3553(a) factors (those concerned with deterrence and ensuring the safety of the community) militate in favor of immediate release.

The court looks next to the sentencing commission's nonbinding guidance in § 1B1.13 of the guidelines. *See Gunn*, 2020 WL 6813995, at *2. Historical data submitted by Villasenor shows steep growth in coronavirus cases at FCI-Oxford in October and November 2020 followed by what appears to be improvement in active cases. *See* ECF No. 1058 Ex. G. As of November 19, 2020, FCI-Oxford reported a total of 19 active cases (10 inmates and 9 staff), but additional inmates and staff (597 inmates and 59 staff) are described as "recovered." Determining exactly what BOP's reported COVID-19 case counts mean is difficult in the absence of interpretative guidance. *But see United States v. Walker*, 2020 WL 6363841, at *2 (C.D. Ill. Oct. 29, 2020) (considering reported case counts at FCI-Oxford).[2]

In email messages to his lawyer dated before the case counts at FCI-Oxford began to fall, Villasenor describes conditions at the prison. *See* ECF No. 1058 Ex. A. Villasenor works weekdays in the prison's powerhouse reading gauges and doing maintenance; he has a job as an on-call driver on the weekends. *Id.* at 2. The conditions he describes include a lack of social distancing among staff and prisoners, a lack of masks and personal protective equipment, a shortage of soap and hand sanitizer, and staff rotating throughout the facility without being tested for the virus. *Id.* at 2–3.

---

[2] *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/index.jsp. BOP statistics as of December 4, 2020, are both inconsistent (in the number of recovered inmates) and worse, indicating 99 inmates testing positive. (Last visited December 4, 2020).

It is well understood that conditions like those Villasenor describes facilitate the rapid spread of diseases like the novel coronavirus in prisons and jails. *E.g.*, *Mays v. Dart*, 456 F. Supp. 3d 966, 976–77 (N.D. Ill. 2020), *aff'd in part, vacated in part, rev'd in part on other grounds*, 974 F.3d 810 (7th Cir. 2020); *see generally Watson et al.*, *COVID-19 and the US Criminal Justice System: Evidence for Public Health Measures to Reduce Risk* (Oct. 2020) ECF No. 1066 Ex. B (report on this subject). Even so, courts around the country have consistently held that the "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *accord*, *e.g.*, *United States v. Forrest*, 2020 WL 5110473, at *2 (N.D. Ill. Aug. 31, 2020) (collecting cases). Additionally, Villasenor's risk of exposure is somewhat mitigated by his being housed in the satellite camp at FCI-Oxford and by working in the powerhouse (ECF No. 1058 Ex. A at 2) where, presumably, few other prisoners congregate.

Although the presence of COVID-19 does not by itself justify Villasenor's release, "a person's underlying health condition(s) and age, in light of the pandemic," may qualify as extraordinary and compelling reasons for a sentence reduction. *Forrest*, 2020 WL 5110473, at *2 (citations omitted). Villasenor's prison medical records reflect a diagnosis of clinical obesity; he has a body mass index (BMI) of 30.4. Medical Records 3, 19, ECF No. 1061 Ex A. He also has a history of hypertension for which he takes daily medication.[3] *Id.* at 2. Courts typically rely on nonbinding guidance from the Centers for Disease Control ("CDC") on groups who are

---

[3] BOP staff also note a history of allergies and gout; Villasenor has been prescribed a nasal steroid and medication for these conditions. Medical Records 2. There is no evidence that these treatments are ineffective. Villasenor also highlights a 2015 record of an acute upper respiratory infection, but he points to no evidence of chronic, or recent. respiratory problems. *See id.* at 21.

10

at increased risk from the novel coronavirus. Under the CDC's guidance, "[h]aving obesity, defined as a body mass index (BMI) between 30 kg/m2 and <40 kg/m2 or severe obesity (BMI of 40 kg/m2 or above), increases your risk of severe illness from COVID-19."[4]

The government acknowledges that Villasenor's obesity "may" satisfy one of the sentencing commission's criteria for release. Resp. 9, ECF No. 1062; *see* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). Yet Villasenor is not severely obese, and his BMI just barely crosses the CDC's threshold of 30 for clinical obesity. Neither does Villasenor's age fall into the high-risk age brackets reported by the CDC. And the CDC's current guidance on hypertension equivocates: hypertension "might" increase a person's risk of serious illness from COVID-19.[5] Notably, BOP medical personnel appear to be attempting to manage Villasenor's hypertension with medication, and there is no indication that Villasenor's high blood pressure has led to other complications. *See* Medical Records 2. Thus, Villasenor's risk from the virus appears to be at most moderately elevated over the general population.[6]

Compassionate release during the COVID-19 pandemic has been more likely to be granted in the presence of multiple risk factors not applicable to Villasenor, such as an advanced

---

[4] The quotations in this paragraph come from *People with Certain Medical Conditions*, Centers for Disease Control and Prevention https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Nov. 2, 2020; visited Nov. 19, 2020).

[5] *See* the source cited in note 4, *supra*.

[6] Since the advent of the COVID-19 pandemic, the court has been forced to assess federal inmates' risk of COVID-19 complications based on imprecise guidance from the CDC, incomplete and rapidly evolving information about how the virus spreads and risk factors, incomplete information about the defendant's medical conditions, and few details about the actual conditions in the federal prisons where the movants are housed. *See generally* Gabriel A. Fuentes, *Federal Detention and the "Wild Facts" During the COVID-19 Pandemic*, 110 J. Crim. L. & Criminology 441, 468–73 (2020) (discussing factual challenges during the COVID-pandemic in the related context of making bail decisions). Obviously, the predictions about health risks during the pandemic can be a matter of life and death. Yet this court has become accustomed to boilerplate briefing from the government like the briefing here conceding that at least one CDC risk factor exists and proceeding to argue in cursory fashion that the sentencing factors do not favor a reduction. *See* Gov't Resp. 9–11, ECF No. 1062. Greater assistance from counsel for all parties would be very welcome.

age, multiple health conditions that increase the risk of serious COVID-19 illness, and a record demonstrating that the defendant is no longer a danger to the community. *See, e.g.*, *United States v. McElrath*, 2020 WL 5423067, at *1–2 (D. Minn. Sept. 10, 2020) (reducing sentence of defendant housed in FCI-Oxford; defendant was scheduled to be released in 2023 and had "numerous serious medical conditions including . . . organ loss in his intestines and stomach"). But several courts have denied compassionate release motions filed by relatively young defendants like Villasenor with one or two COVID-19 risk factors, particularly in cases involving a border line obesity diagnosis. *See, e.g.*, *Walker*, 2020 WL 6363841, at *2–3 (defendant housed at FCI-Oxford; diagnosed with obesity); *United States v. Capo*, 2020 WL 5994500, at *3 (N.D. Ill. Oct. 9, 2020) (denying motion for compassionate release after balancing the § 3553(a) factors in light of the defendant's obesity); *United States v. Rogers*, 2020 WL 4816053, at *2–3 (N.D. Ill. Aug. 18, 2020) (same); *United States v. Shannon*, 2020 WL 3489491, at *3-4 (N.D. Ill. June 26, 2020) (denying compassionate release to an obese 61-year-old defendant with no spread of COVID-19 in his facility, stating, "Defendants who suffer from manageable health conditions, especially at a younger age, do not present extraordinary and compelling circumstances").

*Walker* illustrates what is necessarily a fact-intensive inquiry into the § 3553(a) factors and the reasons for a sentence reduction advanced by the defendant. The defendant in *Walker* sought compassionate release based on his (not severe) obesity and hypertension. The motion was denied in large measure because, after weighing the § 3553(a) factors, the court concluded that he remained too much of a danger to the community to justify his release. *See Walker*, 2020 WL 6363841, at *2–3.

Here, as in *Walker*, Villasenor has an elevated COVID-19 risk per the CDC. But his risk is somewhat moderated by his borderline obesity diagnosis and relatively young age. Additionally, as in *Walker*, the record Villasenor has assembled, particularly the absence of a specific release plan, does not assuage the court's concerns expressed at sentencing about the need to promote respect for the law, deter Villasenor, and protect the public. *See* Sent. Tr. at 87; *Walker*, 2020 WL 6363841, at *2–3; *Capo*, 2020 WL 5994500, at *3; *Rogers*, 2020 WL 4816053, at *2–3.

## Conclusion

The court has weighed the record supporting Villasenor's motion for compassionate release in light of the § 3553(a) factors and the guidance in § 1B1.13 of the sentencing guidelines. For the reasons stated, Villasenor has not established that extraordinary and compelling reasons warrant a sentence reduction to time served. Villasenor's motion for compassionate release is therefore denied.

Dated: December 4, 2020 /s/
Joan B. Gottschall
United States District Judge